UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

DENZEL SAMONTA RIVERS,

                Plaintiff,

v.                                                  Case No. 24-cv-519-pp

HEATHER PAULSEN, *et al.*,

                Defendants.

---

**ORDER GRANTING PLAINTIFF'S MOTION FOR LEAVE TO PROCEED WITHOUT PREPAYING FILING FEE (DKT. NO. 2), SCREENING COMPLAINT UNDER 28 U.S.C. §1915A AND DISMISSING CASE**

---

Plaintiff Denzel Samonta Rivers, an individual incarcerated at Milwaukee Secure Detention Facility (MSDF) who is representing himself, filed a complaint under 42 U.S.C. §1983, alleging that the defendants violated his constitutional rights. This decision resolves the plaintiff's motion for leave to proceed without prepaying the filing fee, dkt. no. 2, and screens his complaint, dkt. no. 1.

**I.    Motion for Leave to Proceed without Prepaying the Filing Fee (Dkt. No. 2)**

The Prison Litigation Reform Act (PLRA) applies to this case because the plaintiff was incarcerated when he filed his complaint. See 28 U.S.C. §1915(h). The PLRA lets the court allow an incarcerated plaintiff to proceed with without prepaying the civil case filing fee. 28 U.S.C. §1915(a)(2). When funds exist, the plaintiff must pay an initial partial filing fee. 28 U.S.C. §1915(b)(1). He then must pay the balance of the $350 filing fee over time, through deductions from his prison trust account. Id.

On May 6, 2024, the court ordered the plaintiff to pay an initial partial filing fee of $40.47. Dkt. No. 5. The court received that fee on May 22, 2024. The court will grant the plaintiff's motion for leave to proceed without prepaying the filing fee and will require him to pay the remainder of the filing fee over time in the manner explained at the end of this order.

**II.    Screening the Complaint**

   A.    Federal Screening Standard

Under the PLRA, the court must screen complaints brought by incarcerated persons seeking relief from a governmental entity or officer or employee of a governmental entity. 28 U.S.C. §1915A(a). The court must dismiss a complaint if the incarcerated person raises claims that are legally "frivolous or malicious," that fail to state a claim upon which relief may be granted, or that seek monetary relief from a defendant who is immune from such relief. 28 U.S.C. §1915A(b).

In determining whether the complaint states a claim, the court applies the same standard that it applies when considering whether to dismiss a case under Federal Rule of Civil Procedure 12(b)(6). See Cesal v. Moats, 851 F.3d 714, 720 (7th Cir. 2017) (citing Booker-El v. Superintendent, Ind. State Prison, 668 F.3d 896, 899 (7th Cir. 2012)). To state a claim, a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The complaint must contain enough facts, "accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v.

Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows a court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556).

To state a claim for relief under 42 U.S.C. §1983, a plaintiff must allege that someone deprived him of a right secured by the Constitution or the laws of the United States, and that whoever deprived him of this right was acting under the color of state law. D.S. v. E. Porter Cnty. Sch. Corp., 799 F.3d 793, 798 (7th Cir. 2015) (citing Buchanan–Moore v. County of Milwaukee, 570 F.3d 824, 827 (7th Cir. 2009)). The court construes liberally complaints filed by plaintiffs who are representing themselves and holds such complaints to a less stringent standard than pleadings drafted by lawyers. Cesal, 851 F.3d at 720 (citing Perez v. Fenoglio, 792 F.3d 768, 776 (7th Cir. 2015)).

B.   The Plaintiff's Allegations

The complaint names as defendants Unit Supervisor Heather Paulsen, MSDF Warden Steven Johnson, Security Director Bradley Everson, John Doe Vaccaro (later identified as Andre D. Vaccaro), John Doe Glanzer, Robert Niccolai, Warden Secretary John or Jane Doe Ballen and Corrections Program Supervisor Erin Whalen. Dkt. No. 1 at 1. The plaintiff alleges that on November 26, 2023, while he was housed at MSDF, he sent all defendants except Niccolai a letter informing them that black mold was in a shower area that he used and in cells on Pod 7-A. Id. at ¶¶1–5. The plaintiff says another incarcerated person saw him use these showers in November and December 2023 and that that

person also complained to staff about the mold. Id. at ¶6. The plaintiff says he was housed in Pod 7-A from October 17, 2023 to January 8, 2024. Id. at ¶7.

On November 28, 2023, the plaintiff felt ill and submitted a request for medical services complaining about tightness in his chest, diarrhea, fatigue and blurred vision "from exposure to BLACK MOLD." Id. at ¶8. He says that "Defendants were made aware" of the mold on, before and after November 28, 2023. Id. at ¶9. The next day, the plaintiff saw a non-defendant registered nurse who ruled out COVID-19 as the source of the plaintiff's symptoms and referred him to a doctor. Id. at ¶10. Doctor Joseph McLean (not a defendant) assessed the plaintiff and determined that he had an upper respiratory infection "that is likely viral in nature." Id. at ¶11. Dr. McLean prescribed medication and a liquid diet to treat the plaintiff's symptoms. Id.

The plaintiff alleges that in November and December 2023, he and other incarcerated persons were not given dish soap or "cleaning material specifically for BLACK MOLD or even MILDEW" to clean the shower area and their cells. Id. at ¶12. He says the "SHOWER CLEANING CART" that had soap and sanitizer was not in working condition, so he was "UNABLE to properly clean" the showers. Id. at ¶13. He alleges that he and other incarcerated persons on the unit were given only a "Toilet Cleaning Packet" and a spray bottle with cleaning solution. Id. at ¶14. The plaintiff avers that this cleaning solution was watered down and not "equipped to remove BLACK MOLD or even MILDEW." Id.

The plaintiff alleges that on November 29, 2023, "Warden's Secretary" Ballen replied to the plaintiff's November 26, 2023 letter about the black mold.

Id. at ¶15. Ballen told the plaintiff to contact Paulsen (the Unit Supervisor) but did not provide him proper cleaning supplies or "away [*sic*] of not being exposed to black mold." Id. (capitalization omitted). The plaintiff says the Department of Corrections has a policy holding all employees responsible for his safety while in custody, and that the defendants are aware of this policy. Id. at ¶16.

The plaintiff alleges that by December 5, 2023, he "was still exposed to BLACK MOLD" on Pod 7-A, so he requested additional medical treatment. Id. at ¶18. The same day, Paulsen came to Pod 7-A and viewed the affected shower area. Id. at ¶19. The plaintiff says Paulsen spoke with some of the incarcerated workers, then left without providing "away [*sic*] of not being exposed to black mold" or proper cleaning supplies or calling maintenance about the issue. Id. Another incarcerated person told the plaintiff during dayroom hours that Paulsen told him she saw the mold in the shower area. Id. at ¶20.

The next day—December 6, 2023—the plaintiff filed an institutional complaint about the black mold. Id. at ¶21. On December 7, 2023, he again saw McLean about his symptoms. Id. at ¶23. McLean noted that the plaintiff reported improvement of his symptoms but was "still having difficulty breathing." Id. He provided the plaintiff medication for his breathing issues and persisting high blood pressure. Id.

The plaintiff alleges that on December 11, 2023, he spoke with Paulsen about the black mold. Id. at ¶25. Paulsen told the plaintiff that the shower cleaner cart "was down" and that the Deputy Warden had contacted her about the complaints of black mold on the unit. Id. The plaintiff reiterated his

complaints about the mold in the showers. Id. Paulsen told him that she would come back the next day with a camera to photograph the mold. Id. The plaintiff alleges that Paulsen still did not provide him cleaning supplies, contact maintenance or move him to an area without mold. Id.

The next day—December 12, 2023—a sergeant (not a defendant) told the plaintiff that Paulsen was coming to take photos of his cell, which she did. Id. at ¶26. The plaintiff says that he again told Paulsen about the black mold in the shower area, but that she did not take photos of that area. Id. On December 13, 2024, the plaintiff received a response to his November 26, 2023 letter from Paulsen, who noted that she had placed a work order for maintenance to "take a look at the unit" and scrub the walls with soap. Id. at ¶¶28–29. The plaintiff says that through January 8, 2024, he was not personally given soap or provided a different cell that did not have black mold. Id. at ¶30. He says that on December 18, 2024, Paulsen put in the work order to Vaccaro, who reported that he "did not see mold in the showers" but that a sergeant told him about "a prior work order" for black mold. Id. at ¶41. Vaccaro noted that he believed "it is 22 years of dirt and dust that are in the crack" of some cells. Id.

The plaintiff alleges that on January 9, 2024, Paulsen and a complaint examiner reviewed his institutional complaint about the black mold. Id. at ¶31. Paulsen reported that there was mildew present but not black mold. Id. The plaintiff says Paulsen falsely characterized the plaintiff's complaint as involving only his cell and not the showers. Id. The plaintiff attached a copy of the

institutional complaint report which shows that Paulsen concluded that his cell contained no black mold but only "dust and dirt from a 20+ year old building." Id. at 32.[1] Paulsen noted the maintenance order to clean the plaintiff's cell. Id. The complaint examiner recommended dismissing the plaintiff's complaint because his concern had been addressed. Id. The plaintiff appealed the dismissal of the complaint. Id. at ¶32. A corrections complaint examiner dismissed the appeal, noting, "While mold was not identified in the room, instruction was provided to clean the room walls." Id. at 34.

In January 2024, the plaintiff sent defendants Everson, Johnson and Whalen letters requesting copies of the photos that Paulsen took of his cell and asking that that they be preserved. Id. at ¶34. He says none of those defendants replied to his request, he characterizes their non-response as an act of retaliation because he filed previous complaints against these defendants. Id. at ¶34, 39. On January 24, 2024, the plaintiff filed another institutional complaint against Everson, Whalen and Johnson for not providing him the photos as he requested. Id. at ¶35. He also sent defendant Niccolai a request for the photos, but Niccolai denied the plaintiff's request because "it would jeopardize the safety and security of inmates, staff, and the institution if plaintiff received photos." Id. at ¶36. The plaintiff says this contradicts Paulsen's report that the photos did not show black mold. Id. He claims that

---

[1] The plaintiff numbered his attachments as continued pages of his complaint, and the clerk's office docketed it the same way rather than as a separate document (such as "Dkt. No. 1-1"). This is a cite to the page number, rather than the paragraph number, to signify that it is a citation to the attachments and not an allegation in the complaint.

7

Niccolai denied him the photos in retaliation for a previous complaint he filed. Id. On February 12, 2024, the plaintiff appealed Niccolai's denial of the photos. Id. at ¶37. He does not describe the result of that appeal.

The plaintiff claims that "[a]ll mentioned Defendants were aware that Plaintiff was exposed to Black Mold" but took no action to ensure his safety. Id. at ¶38. He says that he suffered "medical injuries" from their actions and that their actions "hindered plaintiff from producing photos that will tremendously support plaintiff's claim." Id. at ¶40. The plaintiff claims that the defendants retaliated against him and were deliberately indifferent to his health and safety. Id. at ¶¶42–43. He seeks compensatory and punitive damages. Id. at 46.

  C. Analysis

The court analyzes the plaintiff's allegations about black mold as challenging the conditions of his confinement. Under the Eighth Amendment, a state may not subject prisoners "to conditions of confinement amounting to cruel and unusual punishment." Giles v. Godinez, 914 F.3d 1040, 1051 (7th Cir. 2019) (citing Rhodes v. Chapman, 452 U.S. 337, 345–47 (1981)). The Supreme Court has clarified, however, that only "extreme deprivations" will amount to cruel and unusual conditions of confinement. Id. (citing Hudson v. McMillian, 503 U.S. 1, 9 (1992)). The court must judge the alleged conditions "in accordance with contemporary standards of decency." Id. (citing Hudson, 503 U.S. at 8, and Rhodes, 452 U.S. at 346).

An Eighth Amendment claim consists of objective and subjective components. Farmer v. Brennan, 511 U.S. 825, 834 (1994). To satisfy the

objective component, an incarcerated person must show that he "is incarcerated under conditions posing a substantial risk of serious harm." Id. In the context of a conditions-of-confinement claim, an incarcerated person must show that he has been deprived of "'the minimal civilized measure of life's necessities.'" Wilson v. Seiter, 501 U.S. 294, 298 (1991) (quoting Rhodes, 452 U.S. at 347). To satisfy the subjective component, the plaintiff must demonstrate that the officials knew of an excessive risk of harm to his health or safety and disregarded that risk. Farmer, 511 U.S. at 837; Perez, 792 F.3d at 776. In other words, he must show that prison officials acted with "deliberate indifference" to a substantial risk that the plaintiff would suffer serious harm. Farmer, 511 U.S. at 834; Wilson, 501 U.S. at 303.

The plaintiff's allegations do not satisfy the objective component of an Eighth Amendment claim. The Court of Appeals for the Seventh Circuit has held that in some cases, exposure to black mold may violate an incarcerated person's Eighth Amendment rights. Board v. Farnham, 394 F.3d 469, 486 (7th Cir. 2005). But the Board case involved a ventilation system containing black mold and "black fiberglass dust" blowing into cells over 126 days, which caused daily nosebleeds and severe respiratory problems requiring hospitalization. Id. at 473, 486. Cases in which courts have applied Board typically involved allegations of similar long-term exposure and long-term harm. Compare Day v. Marthakis, Case No. 22-CV-728, 2022 WL 4016965, at *1 (N.D. Ind. Sept. 2, 2022) (incarcerated person alleging blood abnormalities "that all have precursors to several lung related ailments" from at least nine-

9

month incarceration in cell with "asbestos and black mold everywhere, as well as pigeon feces"); Love v. Nicholson, Case No. 19-CV-00550, 2022 WL 267598, at *2 (S.D. Ind. Jan. 28, 2022) (six-to-nine-month exposure to black mold causing breathing problems, burning eyes, nose bleeds and frequent use of inhaler); Johnson v. Coffee, Case No. 119CV03313SEBTAB, 2021 WL 1814927, at *4 (S.D. Ind. May 5, 2021) (incarcerated person alleging "long-term damage to his respiratory system" from being exposed to black mold for 110 consecutive days); with Harris v. McLean C'nty Jail, Case No. 18-CV-1189, 2018 WL 4006780, at *2 (C.D. Ill. Aug. 22, 2018) (dismissing incarcerated person's claim about black mold because he "does not indicate how long he was exposed to these conditions, and his allegations lack sufficient detail tending to suggest the conditions" were objectively serious).

A court in the Western District of Wisconsin explained that, even crediting an incarcerated person's questionable allegations about black mold, "the Eighth Amendment does not guarantee detainees or inmates a 'maximally safe environment, one completely free from pollution or safety hazards.'" Mitchell v. Dane Cnty. Sheriff Dep't, Case No. 16-CV-352-WMC, 2018 WL 851391, at *6 (W.D. Wis. Feb. 13, 2018) (quoting Carrol v. DeTella, 255 F.3d 470, 473 (7th Cir. 2001)). The same is true of the plaintiff's allegations. The plaintiff alleges that he was housed in Pod 7-A from October 17, 2023 through January 8, 2024, but he did not complain about black mold until November 26, 2023. He was exposed to whatever was in his cell (he says it was black mold, but his own allegations reflect that MSDF personnel saw dirt, not black

10
Case 2:24-cv-00519-PP    Filed 06/28/24    Page 10 of 19    Document 11

mold) for only about two weeks (from November 26 to December 12, 2023) before Paulsen entered the work order to clean the unit, and Vaccaro cleaned the unit six days later. The plaintiff does not allege that he suffered any serious or long-term effects from this brief exposure. He alleges only that he twice saw a doctor in November and December 2023 for his symptoms, which improved by the second visit except for one symptom that was not respiratory in nature (high blood pressure). The doctor did not believe these symptoms were related to the plaintiff's cell conditions, attributing them to a viral source. (Black mold is not a virus; "Black mold is a fungus that may cause your immune system to react." https://my.clevelandcinic.org/health/diseases/24862-black-mold.) The complaint does not allege facts sufficient to show that the plaintiff was exposed to extreme conditions posing a substantial risk of serious harm to his health or safety.

Even if the plaintiff had satisfied the objective component, his allegations do not demonstrate that the defendants disregarded an excessive risk to his health or safety. The plaintiff alleges that on November 26, 2023, he sent the defendants a letter saying that he had noticed black mold in his cell and in the shower area on his unit. He says that two days later, he requested medical treatment for various physical symptoms he experienced, which he says were caused by his exposure to the black mold. The doctor who treated him did not confirm that suspicion but provided the plaintiff treatment and medication for his symptoms. (This prompt medical treatment may be why the plaintiff has not named any medical official as a defendant.) Three days after the plaintiff

sent his letter, Ballen responded and advised him to contact Paulsen. On December 5, 2023—only nine days after the plaintiff sent the letter—Paulsen came to his unit to observe the black mold. She returned a few days later to speak with the plaintiff and informed him that she would come back to photograph the suspect areas. She returned the next day to take the photos, and a few days later entered a work order to have the areas scrubbed and cleaned. Paulsen opined that the substance did not appear to be mold and looked like dirt or dust that had accumulated over two decades. Vaccaro, who performed the cleaning, agreed that the substance was dirt and dust, not mold, but he cleaned the affected areas.

The allegations in the complaint do not support a claim that Paulsen (or any other defendant) was deliberately indifferent to the plaintiff's concern about black mold. They show that rather than ignoring or disregarding the plaintiff's letter about black mold, the defendants responded quickly and reasonably, addressed the plaintiff's concern and cleaned the suspected mold. The plaintiff complains that the defendants did not respond quickly enough, and he says that he developed symptoms that he attributes to being exposed to the mold. His conclusion is suspect given Paulsen and Vaccaro's joint conclusion that the substance was not mold and his doctor's conclusion that his symptoms were caused by a virus. But the plaintiff's allegations about his mild symptoms do not change the court's conclusion because he has not alleged that the defendants acted unreasonably in response to his complaints about mold. See Peate v. McCann, 294 F.3d 879, 882 (7th Cir. 2002) ("Indeed, prison

officials who actually knew of a substantial risk to prisoner health or safety are free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted, because in that case it cannot be said that they were deliberately indifferent.")

Even if the plaintiff had stated an Eighth Amendment claim, the complaint does not allege enough to hold several defendants responsible on that claim. "To be liable under § 1983, a defendant must be personally responsible for the violation of a constitutional right." Stankowski v. Carr, Case No. 23-2458, 2024 WL 548035, at *2 (7th Cir. Feb. 12, 2024) (citing Taylor v. Ways, 999 F.3d 478, 493 (7th Cir. 2021)). The complaint fails this basic pleading requirement for Warden Johnson, Security Director Everson and Whalen. The plaintiff alleges only that he wrote to these defendants about the black mold and the photos, but that they did not respond. But Ballen, the warden's secretary, *did* respond and told the plaintiff to contact Paulsen about the issue. The plaintiff may have been dissatisfied with this response, but that is not a basis for Eighth Amendment liability. "Bureaucracies divide tasks; no prisoner is entitled to insist that one employee do another's job." Burks v. Raemisch, 555 F.3d 592, 595–96 (7th Cir. 2009). The Warden, Security Director and Corrections Program Supervisor were permitted to delegate to Ballen and Paulsen the task of responding to the plaintiff's concern. That they did not personally respond to the plaintiff's letter does not mean he can sue them for damages.

13

The plaintiff alleges nothing at all against defendant Glanzer. The only mention of Glanzer in the complaint is that the institutional complaint examiner contacted him in response to the plaintiff's first complaint about the mold. Dkt. No. 1 at 32. It is not clear what position Glanzer holds at MSDF. The only mention of Vaccaro is that he responded to the work order and performed the cleaning. The plaintiff does not allege that he performed a substandard cleaning or that the mold returned. The complaint does not state a claim against Johnson, Everson, Whalen, Glanzer or Vaccaro because it fails to show how any of them were personally responsible for, and deliberately indifferent to, the handling of the alleged black mold.

The plaintiff alleges that Niccolai, Whalen, Johnson and Everson either did not respond to his request for the photos that Paulsen took or denied his request in retaliation for previous complaints he has filed against them. The court analyzes these allegations under the First Amendment. See Bridges v. Gilbert, 557 F.3d 541, 546 (7th Cir. 2009). To state a claim of retaliation, the plaintiff must allege that "he engaged in a protected activity," "he suffered a deprivation likely to prevent future protected activity" and "his protected activity was a motivating factor in the defendants' decision to retaliate." Daugherty v. Page, 906 F.3d 606, 610 (7th Cir. 2018) (citing Perez, 792 F.3d at 783).

The filing of previous complaints generally is protected activity. See Holleman v. Zatecky, 951 F.3d 873, 878 (7th Cir. 2020). And the plaintiff claims that defendants Niccolai, Whalen, Johnson and Everson did not provide him the photos because he filed previous complaints against them. But the

plaintiff also says that Niccolai told him that giving him the photos presented institutional concerns, which would be a legitimate basis for denying the plaintiff's request. This suggests that the defendants would have denied the plaintiff's request for the photos even if he had not filed the previous complaints against them. In other words, the defendants' alleged retaliatory motive did not "*cause* the injury" (denial of the photos). Nieves v. Bartlett, 587 U.S. 391, 398 (2019). That the defendants denied the plaintiff the photos (or did not respond to his request for them) after he filed the complaints against them is not, on its own, sufficient to satisfy this component of a First Amendment retaliation claim. The plaintiff must demonstrate that the retaliatory motive was "a 'but-for' cause" of the adverse action, "meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive."[2] Id. at 398–99.

The plaintiff also has not alleged that he suffered a deprivation likely to prevent future protected activity. This standard is objective and asks "'whether the alleged conduct by the defendants would likely deter a person of ordinary firmness from continuing to engage in protected activity.'" Douglas v. Reeves, 964 F.3d 643, 646 (7th Cir. 2020) (quoting Surita v. Hyde, 665 F.3d 860, 878

---

[2] The plaintiff also contends that Niccolai's reason for not providing him the photos contradicts Paulsen's report of what the photos show. That is incorrect. Paulsen stated that the pictures did not clearly show mold in the plaintiff's cell. Niccolai did not say anything about what the photos show; he told the plaintiff only that allowing the plaintiff to have the photos would present a security or safety risk. These statements do not contradict each other, and both statements may be true—the photos did not show mold, but they nonetheless could present a security concern to the institution.

(7th Cir. 2011)). Because it is an objective standard, "a specific plaintiff's persistence does not undermine his claim." Id. (citing Holleman, 951 F.3d at 880). The only harm the plaintiff alleges is that he did not receive the photos. This is not the type of "deprivation" that would deter a person of ordinary firmness from continuing to file complaints. The defendants' conduct does not support a claim of retaliation. The court will not allow the plaintiff to proceed on a claim under the First Amendment.

To the extent that the plaintiff alleges that the defendants violated Wisconsin Department of Corrections policy in their handling of the alleged black mold, he does not state a claim. Section 1983 protects against only constitutional violations; it does not protect against violations of prison regulations or policies. See Hunter v. Mueske, 73 F.4th 561, 567 & n.1 (7th Cir. 2023); Estate of Simpson v. Gorbett, 863 F.3d 740, 746 (7th Cir. 2017).

Because the conditions the plaintiff describes in his complaint are not objectively sufficiently serious, and because even if they were he fails to allege that the defendants disregarded those conditions, the complaint fails to state a claim for relief under the Eighth Amendment. The complaint also fails to state a First Amendment retaliation claim for the reasons the court has discussed. Although district courts generally give civil plaintiffs at least one opportunity to amend their pleadings, the court need not do so "when 'it is *certain*' that amendment would be futile." See Fields v. Miller, Case No. 21-1419, 2022 WL 1011666, at *3 (7th Cir. Apr. 5, 2022) (citing Runnion *ex rel.* Runnion v. Girl Scouts of Greater Chi. & Nw. Ind., 786 F.3d 510, 519–20 (7th Cir. 2015)). The

plaintiff's complaint is very detailed and thorough in its allegations of facts surrounding this claim, and the plaintiff attached numerous exhibits that bolster the court's conclusions. The court finds that further factual development would be futile and would not change the court's conclusions. The court will not permit the plaintiff to amend his complaint.

### III. Conclusion

The court **GRANTS** the plaintiff's motion for leave to proceed without prepaying the filing fee. Dkt. No. 2.

The court **ORDERS** that this case is **DISMISSED** under 28 U.S.C. §§1915(e)(2)(B) and 1915A(b)(1) because the complaint fails to state a claim. The court will enter judgment accordingly.

The court will document that the plaintiff has incurred a "strike" under 28 U.S.C. §1915(g).

The court **ORDERS** that the agency that has custody of the plaintiff must collect from his institution trust account the **$309.53** balance of the filing fee by collecting monthly payments from the plaintiff's prison trust account in an amount equal to 20% of the preceding month's income credited to the plaintiff's trust account and forwarding payments to the clerk of court each time the amount in the account exceeds $10 in accordance with 28 U.S.C. §1915(b)(2). The agency must clearly identify the payments by the case name and number. If the plaintiff transfers to another county, state or federal institution, the transferring institution must forward a copy of this order, along with the plaintiff's remaining balance, to the receiving institution.

The court will send a copy of this order to the Warden at Milwaukee Secure Detention Facility.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. See Federal Rules of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. See Fed. R. App. P. 4(a)(5)(A). If the plaintiff appeals, he will be liable for the $605 appellate filing fee regardless of the outcome of the appeal. If the plaintiff seeks to proceed on appeal without prepaying the appellate filing fee, he must file a motion in *this court*. See Fed. R. App. P. 24(a)(1). The plaintiff may be assessed another "strike" by the Court of Appeals if it concludes that his appeal has no merit. If the plaintiff accumulates three strikes, he will not be able to file a case in federal court (except a petition for *habeas corpus* relief) without prepaying the full filing fee unless he demonstrates that he is in imminent danger of serious physical injury. Id.

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Rule 59(e) must be filed within **28 days** of the entry of judgment. The court cannot extend this deadline. See Fed. R. Civ. P. 6(b)(2). Any motion under Rule 60(b) must be filed within a reasonable time, generally no more than one year

18

Case 2:24-cv-00519-PP    Filed 06/28/24    Page 18 of 19    Document 11

after the entry of the judgment. The court cannot extend this deadline. See Fed. R. Civ. P. 6(b)(2).

The court expects parties to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated in Milwaukee, Wisconsin this 28th day of June, 2024.

**BY THE COURT:**

_____
**HON. PAMELA PEPPER**
**Chief United States District Judge**